DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court on appeal from the judgment of the Wood County Court of Common Pleas which, following a jury trial that concluded on November 28, 2006, found appellant, Gabriel Caudill, guilty of felonious assault, in violation of R.C. 2903.11(A)(2), a felony of the second degree, and abduction, in violation of R.C. 2905.02(A)(2), a felony of the third degree. Appellant filed a motion *Page 2 
for new trial, which was denied on January 22, 2007. Appellant was sentenced on January 23, 2007, to a term of incarceration of three years as to the felonious assault, and four years of community control sanctions as to the abduction, to be served consecutively. For the reasons that follow, we affirm appellant's convictions.
 {¶ 2} Appellant was charged with felonious assault and abduction as a result of an altercation between appellant and Amber Mitchell, in appellant's home, on March 19, 2006. The following evidence was adduced at trial and is relevant to this appeal.
 {¶ 3} April Rath testified that she was a dispatcher with the Wood County Sheriff's Department and received a 911 call on March 19, 2006, from Mitchell. The recording of the call was identified by Rath and played for the jury. Mitchell identified herself on the recording and stated that she had a knife because her boyfriend, Gabriel Caudill, was trying to kill her, had hit her with a pan "really hard" on her back, and would not let her out of his house. Mitchell told Rath that appellant had told her to "call the cops," but would not let her leave his house. Mitchell stated that she "escaped out of his garage" and ran to her friend's house. She described appellant as "probably [having] blood all over his face because [she] was clawing him." Mitchell also told Rath that appellant had warrants for his arrest in Maumee and Perrysburg "for menacing" because he would not leave her alone. Rath asked Mitchell, "How long has this been going on?" Mitchell responded, "The violence? * * * Since August."
 {¶ 4} Amber Mitchell testified next in the state's case-in-chief. Mitchell testified that appellant was her boyfriend and that she had known him for over a year and a half. *Page 3 
Regarding the incident of March 19, 2006, she stated that she and appellant were arguing, she left the house, but then returned for a cell phone. She testified that they started fighting over the cell phone and then she left and ran to the neighbor's. Mitchell identified her written statement to the police, made on March 20, 2006, her hospital records following the incident, and the photographs taken of her, and her voice on the 911 recording.
 {¶ 5} On cross-examination, Mitchell testified that her written statement to the police omitted "a lot of stuff that had happened. Mitchell stated that appellant picked her up from work around 11:00 p.m., they went to a bar and drank until 2:45 p.m., and then went to appellant's mother's house, where they continued to drink alcohol. Mitchell testified that she was "absolutely" intoxicated, having consumed approximately nine shots of alcohol during the course of the evening. Mitchell testified that she and appellant began to argue, she accidentally grabbed appellant's cell phone, which was identical to her own, and left the house without interference from appellant. While driving away, Mitchell noticed that she had appellant's phone, not her own, and returned to appellant's house to retrieve her phone. Mitchell testified that she was still angry from the argument and walked into the house, uninvited, to continue the argument. Mitchell grabbed her phone off a table, causing appellant to think she had taken his phone. Mitchell testified that appellant demanded the return of his phone:
 {¶ 6} "He wanted his phone back. We started arguing with about [sic] the phone. He wanted his phone back. I think he at that point is telling me to call the police because *Page 4 
he wanted his property back. We started arguing back into the bedroom over the phone. I would not release the phone. That's why there is marks on my hand and my arms because he's trying to get my phone out of my hands, and I wouldn't give it back to him."
 {¶ 7} At some point, appellant and Mitchell left the bedroom and entered the kitchen. Mitchell testified that she grabbed four to eight knives and was being "very aggressive." Mitchell testified that appellant picked up a pan to defend himself and keep her and the knives away from him. She stated, however, that appellant was not attacking her. Mitchell stated that to reach the front door, she would have to go through the dining room and living room, but that there was also a door exiting the kitchen into the garage which was not blocked by appellant. Mitchell left through the garage and ran to a friend's house. Mitchell testified that she was still very angry with appellant when she was speaking with the 911 dispatch operator and left out "important details" such as her aggression toward appellant, and that she had "started the fight."
 {¶ 8} Mitchell further testified on cross-examination that she was still angry with appellant when she wrote her statement for the police. Mitchell had scratched and bit appellant during the incident. She testified that she was concerned about getting into trouble for what she had done and did not want to "incriminate" herself. Mitchell described the incident as "mutual combat."
 {¶ 9} On redirect examination, Mitchell testified that she probably lied to the police when she stated that she only had four drinks. Mitchell stated that she had known *Page 5 
appellant for a little over a year and a half and did not consider the relationship to be an abusive one. Mitchell testified that appellant struck her prior to her grabbing the knives.
 {¶ 10} Joseph Appelhans, Wood County Deputy Sheriff, testified that he responded to the 911 call on March 19, 2006, at approximately 5:00 a.m. Appelhans described Mitchell as "[v]ery emotional, scared, * * * terrified, upset, crying, shaking * * *." Appelhans testified that Mitchell told him that she had been unable to leave appellant's house for two and a half to three hours, that appellant had beaten her several times during that time frame, she was unable to call for help, appellant took the phone away, and hit her with a pan. Appelhans stated that Mitchell was terrified that appellant was out looking for her. Appelhans testified that Mitchell had left appellant's house without a coat or shoes during ten degree weather and had gone to the neighbor's house approximately a tenth of a mile from appellant's. After speaking with Mitchell, Appelhans went to appellant's address. Appellant was found hiding under a pile of debris in a nearby barn. Appellant had Mitchell's purse with him in the barn and a cell phone was found smashed on the driveway. Mitchell told Appelhans that appellant had damaged the cell phone and thrown it in the driveway. Mitchell's car was parked in the driveway, but her keys were never located. On cross-examination, Appelhans testified that Mitchell appeared to have been drinking and that it was hard to get information from her at times.
 {¶ 11} Andrew Webb, Would County Deputy Sheriff, testified that Mitchell appeared "visibly shaken, * * * really scared," was wearing a short sleeved shirt, black *Page 6 
dress pants, was barefoot, had several injuries on her face, some marks on her arms, and smeared blood on the shoulder of her shirt. Webb described appellant's house as "torn apart * * * items all over the place." According to Webb, "[i]t looked like somebody was in a fight throughout the entire house." Webb identified pictures depicting an overturned chair, broken glassware, and an overturned wine or utility rack in the dining room/kitchen area. On cross-examination, Webb testified that Mitchell had stated that she was drinking prior to the incident, but Webb did not consider her drunk. Webb and Appelhans found appellant together in the barn. Webb stated that appellant had a strong odor of alcohol about him and appeared to be sleeping. Webb testified that Mitchell took him through appellant's house and described for him what took place in each room. On redirect, Webb testified that Mitchell told him she grabbed the knives because "she was pinned to the ground, with the defendant beating her, and she was able to open [a drawer] and grab a handful of knives," which she began swinging around in defense to get appellant away from her.
 {¶ 12} Deputy Sheriff Mary Ann Robinson testified that she had specialized training in the area of domestic violence, specifically, how to investigate, interrogate and interview, and how to identify the characteristics of victimization. In addition to investigating crimes, she testified that she renders assistance to victims of violent crimes by finding them needed resources. Under objection from the defense, the trial court recognized Robinson as an expert in the field of domestic violence and victimization. Robinson testified that it is "very common" for victims involved in domestic disputes or *Page 7 
violent crimes to change their stories. According to her training and experience, the reasons victims change their stories include fear, religious beliefs, financial reasons, and drug addiction, with the biggest reason being fear. Fear can stem from threats made by the victimizer that he will kill the victim, her children, or himself. Robinson testified that fights and arguments can be mutual and, therefore, she is careful to investigate whether the victim was involved in the aggression, or just defending herself. Robinson explained that victims sometimes return to a relationship where they were a victim of abuse because of fear, financial reasons, such as not being able to support themselves or their children, or because the victim considers that she caused the altercation. Victims who have low self esteem or have been brainwashed can blame themselves for the violence, thinking that they are stupid, dumb, fat, ugly, etc.
 {¶ 13} After discussing victim behavior generally, Robinson testified regarding her meeting with Mitchell on March 20, 2006, at the sheriff's department. Robinson had taken photographs of Mitchell and identified "a cut" or injury to Mitchell's thumb, a bruise on her wrist, a mark on her back, and a bruise on her knee. Robinson testified that she talked with Mitchell about the characteristics of domestic violence and that Mitchell responded that she "knew about domestic violence because she just went through with it with [sic] her first husband."
 {¶ 14} On cross-examination, defense counsel elicited testimony that Robinson did not know whether Mitchell lived with appellant, had her own means of financial support, or owned her own home. Robinson denied that Mitchell appeared angry, but instead said *Page 8 
she seemed nervous, confused, and shaky. Defense counsel asked if Robinson had "a chance to form an opinion of [Mitchell]." Robinson responded: "That opinion that I, you know, got from her was that she was very much a victim." Robinson also testified that her impression of Mitchell was that she was weak minded, since she had already been involved in a violent relationship with her ex-husband. Robinson further testified that she has investigated situations where the female in the relationship is the aggressor and conceded that every American has a right to defend his or herself.
 {¶ 15} Sergeant Rick Luman, a detective with the Wood County Sheriff's Department, testified that he had responded to the call on March 19, 2006 with Lieutenant Frizzell. Luman identified Wood County Hospital's certificate of identification regarding Mitchell's attached medical report, the pan with which Mitchell indicated she was hit by appellant, and Mitchell's written statement regarding the incident. Luman described Mitchell's demeanor on March 20, 2006, as being "kind of hesitant * * * scared, nervous * * * difficult to talk to." Luman testified that Mitchell's statement at the hospital and written statement the following day were consistent. On March 20, 2006, Mitchell told Luman that she had consumed four beverages, not six to ten as she had testified. Luman also testified that Mitchell told him she grabbed four knives, two in each hand, and that the incident took place over a period of two to three hours.
 {¶ 16} On cross-examination, Luman testified that Mitchell had not told him that she and appellant continued drinking when they went to appellant's house. During his *Page 9 
interview with Mitchell on March 20, 2006, Mitchell told Luman that the argument between her and appellant started because appellant had gotten mad about Mitchell's ex-husband, which "apparently * * * was a sore spot" for appellant. According to Luman, Mitchell told him that after fighting for a period of time, she left appellant's house, but then returned because she had grabbed the wrong cell phone, and that the arguing continued.
 {¶ 17} On redirect, Luman testified that Mitchell told him that she did not desire to get back together with appellant, but stated that he had threatened to harm himself if they did not get back together. Mitchell also told Luman that appellant had stated that he wanted to kill Mitchell's ex-husband. Luman further testified that Mitchell told him that "because of the escalation of the fight, she ran into the bedroom to get away from [appellant]," and that appellant blocked the door, preventing her from leaving.
 {¶ 18} The defense presented Beth Ann Crum, an investigator with the Wood County Public Defender's Office. Crum identified photographs she had taken of appellant that depicted marks on his hands, knuckles, shoulder, neck, arm, face, lower leg, and a bruise on his arm.
 {¶ 19} Mitchell was then called as a defense witness. Mitchell testified that she was angry with appellant when she went in on March 20, 2006, to submit her written statement regarding the incident, and that she appeared nervous and confused only because she feared that she would go to jail for the physical damage she caused appellant, which was more than he had caused her. She stated that she asked Luman if she could *Page 10 
get into trouble for her actions and he assured her "absolutely not." Mitchell testified that she was not living with appellant, had a job and her own money, was not economically dependent on appellant, believed that she would be able to get another man if she wished, and that appellant never "brainwashed" her into believing that the fight was her fault. With respect to the damage in the house, Mitchell testified that she had done it because she was drunk and "being dramatic," but that she was not in fear.
 {¶ 20} Mitchell denied having told anyone that she was beaten for two and a half or three hours. She also denied that the smashed cell phone in the driveway belonged to either her or appellant because they both had their phones after the incident. With respect to the knives, Mitchell testified that she grabbed them with both hands out of a butcher's block, not out of a drawer. Even if appellant was blocking a door, Mitchell stated that she was still able to exit through the garage, which is what she did. Mitchell testified that she was still not scared of appellant, just angry, and that she had visited him in jail.
 {¶ 21} On appeal, appellant raises the following assignments of error:
 {¶ 22} "Assignment of Error No. 1
 {¶ 23} "The verdict, when viewed with inadmissible evidence excluded, was against the manifest weight of the evidence and insufficient as a matter of law.
 {¶ 24} "Assignment of Error No. 2
 {¶ 25} "The trial court erred and abused its discretion by not declaring a mistrial or new trial based on a juror discussing the case with his wife and the same juror speaking *Page 11 
to a prosecution witness at his home and the juror asking the witness to conceal the conversation from the court.
 {¶ 26} "Assignment of Error No. 3
 {¶ 27} "The trial court abused its discretion, erred and prejudiced appellant by allowing a deputy sheriff, who was also involved in the criminal investigation of the appellant, to testify as an expert witness on domestic violence victimization when, inter alia, there is no evidence of domestic violence and the expert testifies on an ultimate issue to be decided by the jury of why a witness may `change their story.'
 {¶ 28} "Assignment of Error No. 4
 {¶ 29} "The trial court abused its discretion and erred by allowing in medical records without proper foundation and denying appellant the right to cross examine the person who claims said records are business records.
 {¶ 30} "Assignment of Error No. 5
 {¶ 31} "Appellant had ineffective assistance of counsel by counsel not seeking a self defense jury instruction and/or the lack of giving a self defense instruction was plain error.
 {¶ 32} "Assignment of Error No. 6
 {¶ 33} "The trial court erred and committed plain error by admitting written statements of witness Amber Mitchell and by allowing the state of Ohio to impeach their own witness.
 {¶ 34} "Assignment of Error No. 7 *Page 12 
 {¶ 35} "The cumulative effect of errors deprived appellant of his right to a fair trial under the Ohio and United States Constitutions as confidence in the result being a just verdict was necessarily undermined."
 {¶ 36} In his first assignment of error, appellant argues that, by excluding all evidence that was improperly admitted during trial, his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. The items appellant asserts should have been excluded from the jury's consideration are (1) Robinson's testimony regarding why victims of violent crimes might change their story; (2) Mitchell's hospital records; and (3) Mitchell's written statement to the police. Because the admissibility of these items were raised in appellant's third, fourth and sixth assignments of error, we will consider these assignment of error before determining the merits of appellant's first assignment of error regarding manifest weight and sufficiency of the evidence.
 {¶ 37} Appellant argues in his third assignment of error that the trial court abused its discretion in allowing Deputy Robinson to testify as an expert regarding victimization in domestic violence cases because the incident between appellant and Mitchell was not a domestic violence situation. In order for the matter to be one of domestic violence, appellant asserts that the state would have had to establish that Mitchell was a family or household member within the meaning of R.C.2919.25, was married to or living with appellant, and/or shared familial or financial responsibilities; none of which applied to Mitchell. Appellant also asserts that the expert impermissibly testified as to matters *Page 13 
within the realm of every day knowledge, in essence rendered an opinion regarding Mitchell's veracity, and was never disclosed by the state prior to being called as a witness. Appellant further argues that, during closing arguments, the state prejudicially made reference to this case as a "domestic dispute."
 {¶ 38} The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v. Haines,112 Ohio St.3d 393, 2006-Ohio-6711, ¶ 50. Although the phrase "battered-woman syndrome" was not used by Robinson, the characteristics she described were consistent with this syndrome. As such, we will consider whether admission of expert testimony regarding battered-woman syndrome was appropriate in this case.
 {¶ 39} If a woman is established to be a battered woman, and the expert is qualified, expert testimony regarding battered-woman syndrome presented in the state's case-in-chief is admissible "to help a jury understand a victim's reaction to abuse in relation to her credibility."Haines at ¶ 29 and 35, citing State v. Koss (1990), 49 Ohio St.3d 213,218. Battered-woman syndrome "meets the requirements of Evid.R. 702 in regard to scientific validity and the requirement of specialized knowledge," but must nevertheless "be admitted in conformance with the Ohio Rules of Evidence." Haines at ¶ 42, citing R.C. 2901.06(A) andKoss.
 {¶ 40} Generally, in accordance with Evid.R. 401, battered-woman syndrome testimony is relevant when used to "`explain a complainant's actions, such as prolonged endurance of physical abuse accompanied by attempts at hiding or minimizing the abuse, *Page 14 
delays in reporting the abuse, or recanting allegations of abuse,'" because "[s]uch seemingly inconsistent actions are relevant to a witness's credibility." Haines at ¶ 44, quoting People v. Christel
(1995), 449 Mich. 578, 580, 537 N.W.2d 194. However, "while such testimony can be relevant for explaining a victim's behavior, it cannot be considered relevant if there is no evidence that the victim suffers from battered-woman syndrome." Haines at ¶ 46. Thus, the party seeking to introduce such evidence "`must lay an appropriate foundation substantiating that the conduct and behavior of the witness is consistent with the generally recognized symptoms of the battered-woman syndrome, and that the witness has behaved in such a manner that the jury would be aided by expert testimony which provides a possible explanation for the behavior.'" Id. at ¶ 47, quoting State v.Stringer (1995), 271 Mont. 367, 378, 897 P.2d 1063. Further, to be classified as a battered woman, "the couple must go through the battering cycle at least twice." Id. at ¶ 49, citing Koss at 216.
 {¶ 41} Evidence regarding battered-woman syndrome is not limited to cases where domestic violence is the underlying charge, and does not require a showing that the parties lived together. However, the Ohio Supreme Court has recognized that "[i]n cases where domestic violence is not the underlying charge, but battered-woman-syndrome testimony is offered to explain the conflicting statements or activities of a witness, a defendant can again be prejudiced by being labeled as a batterer." Haines at ¶ 55. Thus, the admissibility of expert testimony on battered-woman syndrome must be carefully balanced under Evid.R. 403. Id. *Page 15 
 {¶ 42} Evid.R. 403(A) states that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." In order to "dispel concerns about unfair prejudice," the Ohio Supreme Court recognizes that an acceptable balance is best achieved through limiting the expert's testimony by not allowing the expert to (1) opine that the complainant was a battered woman; (2) testify that appellant was a batterer or guilty of a crime; or (3) comment on the complainant's veracity. Id. at ¶ 56. The expert, however, can testify to the general characteristics of a victim suffering from the battered-woman syndrome. Id. The absence of expert opinion testimony allows the jury to be aided with information regarding battered-woman syndrome without interfering or impinging on its role in determining the credibility of witnesses. Id. The jurors must also be properly instructed regarding the limits of the expert's testimony. Id. at ¶ 57.
 {¶ 43} Accordingly, contrary to appellant's arguments, expert testimony regarding battered-woman syndrome is scientifically based and not within the realm of every day knowledge, is permitted in cases other than those charging domestic violence, and is not limited to married couples, parties who live together, or who share familial or financial responsibilities. See Haines, supra. In this case, the state established through Mitchell's own statement to the 911 operator that the violence in her relationship with appellant had been going on since the previous August, and that appellant had pending charges against him because he would not leave her alone. We find that this is sufficient to establish that Mitchell behaved in a manner consistent with a "battered woman." We further find that *Page 16 
Robinson was properly found to be an expert in the field of domestic violence and victimization and, therefore, was qualified to provide testimony concerning why a victim of a violent crime might change her story, recant a statement to the police, or accept blame for the incident.
 {¶ 44} During the state's case-in-chief, in compliance withHaines, Robinson gave no opinion regarding whether Mitchell was a battered woman, told the truth, or whether appellant was a batterer or guilty of a crime. On cross-examination, the defense elicited an opinion from Robinson that Mitchell was "very much a victim"; however, we find that any error in this regard was invited by the defense and was not in response to any questions posed to the expert during her direct examination. "Under the invited-error doctrine, a party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make." State ex rel. Bitter v. Missig (1995),72 Ohio St.3d 249, 254, citing State ex rel. Fowler v. Smith (1994),68 Ohio St.3d 357, 359.
 {¶ 45} With respect to appellant's argument that Robinson was not disclosed as a potential expert witness prior to trial, we find that defense counsel never objected to Robinson's testimony on this basis. Additionally, we find that no objection was made regarding the state's reference to this case being a "domestic dispute."
 {¶ 46} Failure to object at trial waives all but plain error. Evid.R. 103(A)(1). Notice of plain error is taken to prevent a miscarriage of justice, under exceptional circumstances. State v. Long (1978),53 Ohio St.2d 91, paragraph three of the syllabus. A plain error is an error which affects a substantial right of the accused and without the *Page 17 
error, the outcome of the trial would have been different. State v.Myers, 97 Ohio St.3d 335, 2002-Ohio-6658, ¶ 82. The defense thoroughly cross-examined Robinson and was not prejudiced by any alleged failure to disclose an expert witness. Also, although appellant was not charged with domestic violence, we find that referring to the incident as a "domestic dispute" was not prejudicial to appellant. Upon review, we find that no plain error exists in either respect.
 {¶ 47} Based on the foregoing, we find that the trial court did not abuse its discretion in allowing Robinson's expert testimony. Appellant's third assignment of error is therefore found not well-taken.
 {¶ 48} Appellant argues in his fourth assignment of error that the trial court abused its discretion by allowing Mitchell's hospital records to be admitted without proper foundation. Appellant also argues that he was denied the opportunity to cross-examine the person who claimed that the medical records were business records.
 {¶ 49} In this case, Mitchell identified her hospital record and, thus, the record was properly admitted pursuant to Evid.R. 901(B). Alternatively, we find that the hospital record was self-authenticating, in accordance with R.C. 2317.422, and, thus, no extrinsic evidence of authenticity was required. See Evid.R. 902(10) and State v. Perry
(1996), 108 Ohio App.3d 709, 714. Additionally, we find that appellant was not denied his right to confront witnesses against him in this regard. Mitchell was thoroughly cross-examined by appellant. Also, it is well-settled that admission of hospital records in accordance with R.C.2317.422 does not violate a defendant's confrontation rights. State v.Spikes *Page 18 
(1981), 67 Ohio St.2d 405, paragraph one of the syllabus. Accordingly, we find appellant's fourth assignment of error not well-taken.
 {¶ 50} Appellant argues in his sixth assignment of error that the trial court committed plain error by admitting Mitchell's written statement to the police in an effort to impeach Mitchell's trial testimony. Appellant failed to object to the introduction or admission of Mitchell's written statement and, therefore, has waived all but plain error on appeal. See Evid.R. 103(A)(1). Appellant argues that the state introduced Mitchell's written statement prior to any questioning of the witness and that this was done "presumably to impeach her testimony upon cross."
 {¶ 51} Initially, we note that Mitchell was asked if she made a statement and was then asked to identify her statement during her direct examination; however, the contents of the statement were never discussed. Upon cross-examination, Mitchell testified that she left out some details from her written statement. On re-direct, she testified that she had "probably lied" in regarding how many drinks she had consumed on the night of the incident. Additionally, when asked if she told Luman that appellant struck her before she grabbed the knives, Mitchell denied having included such information in her statement.
 {¶ 52} Evid.R. 607(A) allows the credibility of a witness to be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage. "Surprise is adequately demonstrated if the testimony is materially inconsistent with the prior statement, and counsel did not have reason to believe the witness would change his testimony."State v. Blair (1986), 34 Ohio App.3d 6, 9, *Page 19 
citing State v. Reed (1981), 65 Ohio St.2d 117, 125. "Affirmative damage occurs if the party's own witness testifies to facts that contradict, deny, or harm that party's trial position." Id., citing State v.Stearns (1982), 7 Ohio App.3d 11, 15.
 {¶ 53} Pursuant to Evid.R. 613(B), extrinsic evidence of a prior inconsistent statement by a witness is admissible if both of the following apply: (1) "the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require"; and (2) the subject matter of the statement is a fact that "is of consequence to the determination of the action other than the credibility of a witness, * * * may be shown by extrinsic evidence under Evid.R. 608(A), 609, 616(B) or 706, or * * * may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rules of Evidence."
 {¶ 54} In this case, Mitchell's testimony contradicted, in part, her written statement to the police regarding the nature of the incident and appellant's actions, and included exculpatory statements on appellant's behalf. There is no evidence in the record that the state was expressly forewarned of Mitchell's intention to repudiate her earlier statements. Accordingly, we find that the trial court did not abuse its discretion in admitting Mitchell's written statement to the police and that plain error does not exist in this regard. Appellant's sixth assignment of error is therefore found not well-taken. *Page 20 
 {¶ 55} Having determined that no error exists with respect to the admission of Robinson's testimony, Mitchell's hospital records, or Mitchell's written statement, we may consider these items in determining whether there was sufficient evidence presented to sustain appellant's convictions and whether the jury's decision was against the manifest weight of the evidence. Although we find the above items were properly before the jury, appellant asserts that the following excerpts from Mitchell's testimony establish that his convictions should be vacated: (1) the altercation was mutual combat; (2) she was not hit with a pan by appellant; (3) she was "absolutely" intoxicated; (4) she was not prevented from leaving; (5) she instigated the argument with appellant when she returned to the house; (6) she caused multiple bite and scratch injuries to appellant; (7) she was aggressive and grabbed knives; (8) appellant had picked up the pan to defend himself against her and the knives; (9) her statement to the police left out a lot of details; (10) she was angry with appellant and wanted him to get into trouble; and (11) she did not want to get into trouble herself Appellant also argues that the state did not establish that Mitchell was harmed by the pan. Further, appellant argues that Mitchell's testimony disputes the theory that she was a battered woman.
 {¶ 56} Crim.R. 29(A) states that a court shall order an entry of judgment of acquittal if the evidence is insufficient to sustain a conviction of the offenses. As such, the issue to be determined with respect to a motion for acquittal is whether there was sufficient evidence to support the conviction. Sufficiency of the evidence and manifest *Page 21 
weight of the evidence are quantitatively and qualitatively different legal concepts. State v. Thompkins (1997), 78 Ohio St.3d 380, 386.
 {¶ 57} "Sufficiency" applies to a question of law as to whether the evidence is legally adequate to support a jury verdict as to all elements of a crime. Id. In making this determination, an appellate court must determine whether, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 58} When considering whether a judgment is against the manifest weight of the evidence in a bench trial, an appellate court will not reverse a conviction where the trial court could reasonably conclude from substantial evidence that the state has proved the offense beyond a reasonable doubt. State v. Eskridge (1988), 38 Ohio St.3d 56, 59. The court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the court "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Thompkins at 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. The discretionary power to grant a new trial should be exercised only in exceptional cases where the evidence weighs heavily against the conviction. Id.
 {¶ 59} In pertinent part, pursuant to R.C. 2903.11(A)(2), no person shall knowingly "[c]ause or attempt to cause physical harm to another * * * by means of a *Page 22 
deadly weapon or dangerous ordnance." R.C. 2923.11(A) defines "deadly weapon" as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." Any person violating R.C.2903.11(A)(2) is guilty of felonious assault.
 {¶ 60} Additionally, any person in violation of R.C. 2905.02(A)(2) is guilty of abduction. R.C. 2905.02(A)(2) states that no person, without privilege to do so, shall knowingly "[b]y force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear."
 {¶ 61} After viewing the evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of the crimes of felonious assault and abduction. In addition to Mitchell's testimony at trial, the jury heard her call to 911, which was placed immediately following the incident, and her statement to the sheriff's department. Thus, evidence was presented that, attendant to the incident, Mitchell believed that appellant would not allow her to leave; was going to kill her; and had hit her with a pan. The jury was also presented with photographs of Mitchell which showed a mark on her back.
 {¶ 62} Appellant, however, additionally argues that the convictions were against the manifest weight of the evidence because of Mitchell's trial testimony. The jury, however, is the sole judge of the weight of the evidence and the credibility of witnesses, and "may believe or disbelieve any witness or accept part of what a witness says and *Page 23 
reject the rest." State v. Antill (1964), 176 Ohio St. 61, 67. Upon review of the entire record, we find that the jury could reasonably conclude from the evidence presented that the state proved the offenses of felonious assault and abduction beyond a reasonable doubt. We further find that the trier of fact did not clearly lose its way or create a manifest miscarriage of justice. Accordingly, we find appellant's first assignment of error not well-taken.
 {¶ 63} Appellant argues in his second assignment of error that the trial court abused its discretion by not declaring a mistrial. On December 1, 2006, following the jury's guilty verdict, appellant filed a motion for new trial on the basis that he was denied an impartial and disinterested jury. Specifically, appellant asserted that Mitchell spoke with a juror and discussed the case in the evening of the first day of trial before the defense rested, and that the juror failed to disclose this conversation to the trial court.
 {¶ 64} The juror in question knew Mitchell, prior to trial, because his wife had worked with Mitchell and he had seen her at her current place of employment.[1] Attached to appellant's motion for new trial was an affidavit from Mitchell which stated that she had called the juror's wife on November 27, 2006, but was told she was not at home by a female who answered the phone. Mitchell attested that the juror then got on the phone and engaged her in "dialogue," wherein the juror stated that the case was a "bunch of shit"; appellant's lawyer was an "injustice" and would not do appellant any good; asked *Page 24 
how much the lawyer was being paid; indicated that he had discussed the case with his wife; said that he told his wife that Mitchell "got the best of appellant; asked if Mitchell was still dating appellant, which she indicated she was; discussed the length of sentence appellant was facing; and generally discussed Mitchell's welfare. According to Mitchell, the juror then said that they should not be talking about the case because they could get into trouble, to which Mitchell responded that she thought only appellant was prohibited from talking to the jurors. Mitchell attested that the juror stated that he would not mention the conversation to anyone and she agreed to keep it a secret.
 {¶ 65} The trial court held a hearing on appellant's motion on January 18, 2007. The juror recounted the conversation with Mitchell as follows:
 {¶ 66} "Amber [Mitchell] called the house [and] talked to my daughter. Talked-asked to talk — I don't know if she asked my daughter to talk to me or not, but my daughter handed me the phone, and I talked to Amber and asked her how she was, told her that I thought his lawyer was a joke, wasn't doing him any good, told her that I told my wife that Amber was a victim, and that they had gotten into a fight, looked like to me that Amber got the best of him. Amber told me that he was looking at eight years, and basically I told her, well, you know, Amber, I probably really shouldn't be talking to you because I don't know if we can get in trouble or not. She goes, well, okay if you can't tell nobody, I wouldn't tell nobody. It's basically the end of the conversation."
 {¶ 67} The juror testified that he did not tell anyone, including the trial court and the other jurors, that he had spoken with Mitchell. He also testified that, during *Page 25 
deliberations, his association or knowledge about Mitchell was never discussed. In fact, the juror testified that none of the jurors was aware that he had known Mitchell prior to the deliberations. He also testified that Mitchell never asked or directed him how to vote on the case, and that his conversation with Mitchell had no effect on his ability to be fair and impartial.
 {¶ 68} On cross-examination, the juror testified that he had asked Mitchell if she was still dating appellant because her "actions" appeared to indicate that she was and he was curious. By asking that question, however, the juror did not consider that he was investigating the case outside of court. The juror also stated that he did not know that Mitchell was on the phone when it was handed to him and he denied that he "engaged" her in conversation, but instead stated that she had engaged him by calling his house. The juror further testified that he had not made a judgment on the merits of the case when he told his wife that Mitchell was "the victim" because he was merely identifying the victim in the case. He also did not feel that whether Mitchell got the best of appellant during the incident was relevant to appellant's guilt. According to the juror, Mitchell volunteered the information regarding appellant's potential jail sentence, the juror did not ask her for this information. He testified that he did not disclose the conversation with Mitchell because he did not consider it a "big deal" since, in his opinion, he had not discussed the merits of the case.
 {¶ 69} The state next called the jury's foreperson who testified that, during deliberations, there was no discussion by anyone regarding outside conversations. He *Page 26 
also testified that he did not feel that any of the jurors automatically formed an opinion about the case, and that everyone offered their own thoughts about the evidence presented. He stated, "Everyone offered varying thoughts and we did a good job I thought personally of making sure that we stuck to just the facts and the testimony given during the trial." The foreperson further testified that none of the jurors expressed that they knew Mitchell or that she could or could not be trusted; rather, he stated, "Everything that was discussed within deliberations was of the trial itself. As I recall there were no outside influences. No one brought up anything personal."
 {¶ 70} On cross-examination, the foreperson testified that he recognized Mitchell when she testified, which he had disclosed to the trial court in a separate voir dire. The foreperson had informed the court that she had served him at the restaurant where she works; however, counsel elicited on cross-examination that he did not disclose that a friend of his had dated Mitchell. The foreperson recalled that he only met her in passing once, and had disclosed that to the trial court. He further testified that, because of the trial court's admonishments, had he been approached by someone regarding the trial, he would have disclosed the incident to the court.
 {¶ 71} An additional juror, who did not know Mitchell, testified regarding the deliberations. She testified that she did not know that any of the jurors knew Mitchell until after the trial; no one mentioned that they had any outside conversations regarding the case; no "feelings" regarding a particular witness were discussed; and that the deliberations were conducted in a professional manner, with everybody having a fair *Page 27 
opportunity to contribute to the discussion. On cross-examination, she testified that she recalled the trial court's admonishments and that she would have disclosed to the court if someone had approached her regarding the case. On redirect, she testified that she was not aware during the deliberations that one of the jurors may have had an outside conversation regarding the trial.
 {¶ 72} Mitchell was called by the defense to testify at the hearing. Mitchell stated that she was under subpoena by the state to testify. When asked if the prosecutor continued to instruct her after she testified, Mitchell stated, "Well, the only thing she had said to me was when, Endra, [appellant's] sister walked out into the lobby to talk to me, [the prosecutor] came out and said we were not to be speaking to each other throughout the trial." Mitchell, however, testified that she was never told not to talk to any of the jurors.[2] Mitchell stated that she called the juror's home to speak to his wife, that a young girl answered the phone, and then the juror got on the line. In keeping with her affidavit, she repeated what was discussed, but added that the juror had indicated that his wife was interested in knowing whether Mitchell was still with appellant and that she had volunteered the information regarding appellant's potential sentence. Mitchell opined that the juror had already formed an opinion regarding the case when he stated that the case was a "bunch of shit."
 {¶ 73} On cross-examination, Mitchell testified that she had called the juror's wife, but when the juror picked up the phone, she did not hang up because she wanted to hear *Page 28 
what he had to say. She testified that she had been told by the prosecutor and court security not to discuss the case, but reiterated that she was not told she could not speak with the jurors. She further testified that she did not disclose the conversation to anyone until after the guilty verdict was rendered.
 {¶ 74} In ruling on appellant's motion, the trial court held that Mitchell, who was technically a witness for the state, and the juror she called, committed misconduct by speaking on the phone while the trial was on-going. As such, the trial court held that those portions of R.C.2945.79 and Crim.R. 33, which allow for a new trial in certain instances, where there has been misconduct of a state witness or a juror, were implicated. In considering whether the misconduct prejudiced appellant, or materially affected his substantial rights, the trial court found the following factors to be relevant: (1) no member of the jury knew that the conversation had taken place; (2) the telephoned juror testified that the conversation did not affect how he decided the case; (3) the conversation did not include "specifics" of the trial; (4) Mitchell, although technically a witness for the state, testified in manner that was hostile toward the prosecution; (5) Mitchell's testimony and actions throughout the trial, in associating with appellant and his family, gave a "clear message" that Mitchell was in appellant's "corner" in this case; and (6) Mitchell called the juror's home "with the specific intention of affecting that juror's performance and not in favor of the State of Ohio," but for appellant's benefit. The trial court further considered the specifics of what was said during the conversation, that the juror thought the case was "BS", that Mitchell was still with appellant, that appellant faced eight years *Page 29 
in jail, and that Mitchell got the best of appellant, and found that they were not helpful to the state's case against appellant and, therefore, not prejudicial.
 {¶ 75} On appeal, appellant argues that his rights were prejudiced by the misconduct. Appellant asserts that the juror having information that Mitchell and appellant were still together, "plays right into the hocus pocus of the so-called expert witness." Appellant also asserts that Mitchell's conduct could create a hostile situation with the juror because it appeared as though appellant was behind the call, which "any juror would resent." Appellant argues that it "was highly inappropriate" for the trial court to declare that Mitchell was in appellant's "corner" because "there are no `corners' in the court, only the truth," Mitchell was not adversarial or hostile to the state, and "a witness should not be judged by who their testimony helps or hurts."
 {¶ 76} Pursuant to Crim.R. 33(A)(2) and R.C. 2945.79, a new trial may be granted if misconduct of the jury or a witness for the state materially affected a defendant's substantial rights. No motion for new trial shall be granted "unless it affirmatively appears from the record that the defendant was prejudiced thereby or was prevented from having a fair trial." Crim.R. 33(E). The trial court's determination of a motion for new trial is given great deference and will not be reversed absent an abuse of discretion. State v. Glover (1988), 35 Ohio St.3d 18, 19. The deference given is "in recognition of the fact that the trial judge is in the best position to determine whether the situation in his courtroom warrants the declaration of a mistrial." Id. To reverse on an abuse of discretion, we would have to find that the trial court's attitude was arbitrary, *Page 30 
unreasonable, or unconscionable. Koch v. Rist (2000), 89 Ohio St.3d 250,252, citing, Berk v. Matthews (1990), 53 Ohio St.3d 161, 169. "When confronted with extraordinary circumstances, a trial court must be allowed to consider all of the pertinent circumstances in arriving at a decision." Koch at 252.
 {¶ 77} It is well-settled that a judgment should not be reversed because of juror misconduct "unless prejudice to the complaining party is shown." State v. Kehn (1977), 50 Ohio St.2d 11, 19, citing,Armleder v. Lieberman (1877), 33 Ohio St. 77. A new trial should be granted "where there has been irregularity or misconduct on the part of the jury, which might affect its judgment, or improperly influence the verdict." Armleder, paragraph one of the syllabus. However, where "it clearly appears that no improper effect could arise from the alleged misconduct, the verdict should stand." Id. The Ohio Supreme Court has held that "[c]onversations by a third person with a juror during the progress of a trial for the purpose of influencing the verdict may invalidate the verdict, but where there is nothing in the record to demonstrate that the decision might have been influenced by such conversation, the refusal of the trial court to grant a new trial will not be disturbed." State v. Hipkins (1982), 69 Ohio St.2d 80, 83, citingState v. Higgins (1942), 70 Ohio App. 383.
 {¶ 78} In this case, there was ample testimony presented that, except those involved, the jury did not know that any juror had communicated with Mitchell, or even knew her. No personal information was expressed by any juror during deliberations concerning any witness. Moreover, the juror who spoke with Mitchell testified that he *Page 31 
did not disclose the conversation because he did not consider it to be of any significance, which would include the information that Mitchell was still "with" appellant, and that the conversation had no effect on his deliberations.
 {¶ 79} With respect to the specifics of the conversation, although the juror expressed dislike of appellant's trial counsel to Mitchell, the merits of the case were never discussed. Whether Mitchell had gotten the better of appellant during the incident was not an issue relevant to whether the state proved its case beyond a reasonable doubt. Additionally, we concur with the trial court that the juror's statement to the effect that the case was "a bunch of BS," if anything, was a favorable statement for the defense. In any event, the juror's statements did not demonstrate that he was colluding with Mitchell to enter a verdict for the state. Likewise, Mitchell's volunteer of information regarding appellant's potential jail sentence could be viewed as her attempt to garner sympathy for appellant with the juror and, clearly, was not information that was advantageous to the state or prejudicial to appellant. The juror apparently told his wife that Mitchell was the victim in the case; however, it was not established that he had rendered an opinion regarding the merits of the case at that time. Rather, based on the juror's testimony, he seemed to have merely identified Mitchell's connection to the case for his wife.
 {¶ 80} The trial court was in the best position to view the witnesses and determine what effect, if any, the conversation Mitchell and the juror had on the deliberations. Under the circumstances in this case, we find that the trial court did not abuse its discretion by denying appellant's motion for new trial and finding that appellant was not *Page 32 
prejudiced by the juror/witness misconduct. Appellant's second assignment of error is therefore found not well-taken.
 {¶ 81} Appellant argues in his fifth assignment of error that appellant was denied the effective assistance of trial counsel due to counsel's failure to seek a self-defense jury instruction and/or that the lack of a self-defense instruction was plain error. Initially, we note that appellant's trial counsel and appellate counsel are one and the same. "It is well-established that in a direct criminal appeal where appointed counsel is the same attorney appointed to represent the defendant at trial, he is presumed to be incapable of effectively arguing that he was ineffective at the trial level." State v. Leahy
(Dec. 22, 2000), 6th Dist. No. F-00-011, citing State v. Fuller (1990),64 Ohio App.3d 349, 356.
 {¶ 82} Additionally, we find that there was no plain error with respect to the trial court's failure to instruct the jury on self-defense. A trial court is not obligated to instruct the jury regarding a claim of self-defense, and has the discretion to completely remove it from the jury's consideration, "[i]f the evidence adduced at trial is legally insufficient to raise the issue of self-defense."State v. Barnd (1993), 85 Ohio App.3d 254, 259. To establish self-defense, appellant must show that (1) he "was not at fault in creating the situation giving rise to the affray"; (2) he had "a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of * * * force"; and (3) he did not violate "any duty to retreat or avoid the danger." State v. Robbins (1979), 58 Ohio St.2d 74, paragraph two of the syllabus. The elements of self-defense are cumulative. Thus, "[i]f the defendant fails to prove any one *Page 33 
of these elements by a preponderance of the evidence he has failed to demonstrate that he acted in self-defense." State v. Jackson (1986),22 Ohio St.3d 281, 284. See, also, State v. Williford (1990),49 Ohio St.3d 247, 249.
 {¶ 83} In this case, the evidence establishes that appellant was fighting with Mitchell over her ex-husband, initially, and then later a cell phone. When appellant saw Mitchell pick up a cell phone, he tried to pry it from her hand, incorrectly believing it belonged to him. As such, appellant did not establish that he was not at fault in creating the situation which gave rise to the affray. Additionally, although Mitchell was brandishing knives, no evidence was presented that appellant believed himself to be in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of force. Moreover, we note that appellant struck Mitchell on her back with the pan.
 {¶ 84} Accordingly, we find that it was not plain error for the trial court to fail to instruct the jury on self-defense. Appellant's fifth assignment of error is therefore found not well-taken.
 {¶ 85} Appellant argues in his seventh assignment of error that the cumulative effect of errors deprived him of his right to a fair trial. Having found no errors in this case, we find appellant's seventh assignment of error not well-taken.
 {¶ 86} On consideration whereof, this court finds that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Wood County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant *Page 34 
to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Wood County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Peter M. Handwork, J., Mark L. Pietrykowski, P.J., Arlene Singer, J., CONCUR.
[1] When Mitchell testified, the juror recognized her and disclosed this knowledge to the court, outside of the presence of the rest of the jury. The juror, in fact, was one of three who knew Mitchell. One juror was dismissed for cause, but the juror in question, and the eventual jury foreperson, remained on the jury, having both indicated they could be fair and impartial.
[2] Endra was not a witness, but had been listening to the trial testimony, and was seen leaving the courtroom to talk to Mitchell after a witness had testified. Because separation of witnesses had been ordered by the trial court, the prosecutor was instructed to inform Mitchell regarding separation of witnesses. *Page 1