[Cite as *State v. Ross*, 2025-Ohio-1853.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio                                        Court of Appeals No.  E-24-028

　　　　Appellee                              Trial Court No.  2023 CR 0057

v.

Marieon Ross                                    **DECISION AND JUDGMENT**

　　　　Appellant                             Decided:  May 23, 2025

* * * * *

Kevin J. Baxter, Erie County Prosecuting Attorney,
and Kristin R. Palmer, Assistant Prosecuting Attorney,
for appellee.

Loretta Riddle, for appellant.

* * * *

**MAYLE, J.**

{¶ 1} Appellant, Marieon Ross, appeals the November 18, 2024 judgment of the Erie County Court of Common Pleas sentencing him following his conviction of felonious assault.  For the following reasons, we affirm.

## I. Background and Facts

{¶ 2} Ross was indicted on one count each of attempted murder in violation of R.C. 2923.02 and 2903.02(B), a first-degree felony; felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony (count 2); felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony (count 3); and tampering with evidence in violation of R.C. 2921.12(A)(1), a third-degree felony. The attempted murder and felonious assault charges included repeat violent offender specifications under R.C. 2941.149(A). The charges arose from allegations that Ross stabbed the victim, T.M.

{¶ 3} Ross's case was tried to a jury. The state presented the testimony of Sandusky Police Department officer Patrick O'Connor, detectives Carissa Cruz and Eric Costante, and lieutenant Daniel Lewis, and an Erie County sheriff's deputy. T.M. did not testify. Ross, who represented himself at trial, did not present any witnesses.

{¶ 4} During the deputy's testimony, the state played several 911 calls for the jury. In the first, a woman (later identified as Katina Ross) who said she was Ross's mother called to report a stabbing. She told the dispatcher that the person who was stabbed was already on the way to the hospital and reported that the stabber was Marieon Jakur Ross or Lewis, who had just been released from prison the day before. She did not witness the stabbing, but saw the victim, who told her that he had been stabbed, running to get into his car to go to the hospital.

{¶ 5} In the second call, someone from the Sandusky Police Department called Katina to ask if she knew where Ross was. She told the caller that she did not, but when

2.

"he came out the door, he was outta sight." She also reported that Ross was wearing black tennis shoes, gray sweatpants, and a navy-blue jacket.

{¶ 6} The third and fourth 911 calls came from Firelands Regional Medical Center, the first hospital where T.M. sought treatment. In one call, the caller reports that a person with a stab wound to his stomach had just come into the hospital. In the other, he calls back to report that the victim is T.M.

{¶ 7} Cruz, one the detectives assigned to this case, testified that she went to the home where T.M. was stabbed. When she got there, she did not know where either Ross or T.M. was.

{¶ 8} Cruz obtained video from the house's doorbell and living room security cameras. She identified T.M. and Ross in the videos and said that Ross was wearing a black hoodie and "white-grayish pants." The videos from the living room show T.M. sitting on the couch watching TV and talking on the phone. Ross comes into the frame, walks behind the couch where T.M. is sitting, and opens a side door that leads outside. He then walks up to T.M. from behind, stabs at him three times with what appears to be a knife, and runs out the open side door. T.M. jumps up from the couch and examines his stomach. Katina walks into the room as T.M. is looking at his wound and asks him "[w]hat did that" or "[w]hat is that[.]" When T.M. responds with what sounds like "[t]hat [n-word] stabbed me," Katina shouts "[o]h my God, my son did that" and "Marieon." After that, Katina and T.M. both leave through the side door. Soon after, Katina comes

3.

back while on a phone call and tells the person she is talking to that she is on her way to the hospital because "Marieon just stabbed [T.M.]."

{¶ 9} The videos from the doorbell cameras show Ross running out the side door, around the front of the house, and down the street away from the house.

{¶ 10} The police did not recover the knife Ross used to stab T.M. or determine Ross's motive for the stabbing. Cruz believed that Ross opening the side door before stabbing T.M. was a sign that Ross planned the attack. The shirt that T.M. was wearing that day was covered in blood and had a rip in the same area as T.M.'s abdominal stab wound.

{¶ 11} On cross-examination, Cruz explained that she knew Ross was the assailant on the video "[b]ecause [he] came and made a report before and [she] had to investigate it . . . ."

{¶ 12} O'Connor, one of the officers who responded to Firelands, testified that he went to the hospital to obtain further information about the stabbing victim. While there, he took pictures of the interior of T.M.'s car, which show blood on the right side of the driver's seat and the center console, and pictures of T.M.'s injuries, which show wounds on the left side of his upper abdomen and his right hand below his middle finger. O'Connor described the wounds as "puncture wound[s] to [T.M.] that appeared to be from a knife or some other such object . . . ." He tried to speak to T.M. about what had happened, but T.M. "was not cooperative and did not want to speak with [O'Connor]."

4.

{¶ 13} On cross, O'Connor said that this was not his first encounter with T.M., and he thought that there were active warrants for T.M.'s arrest.

{¶ 14} Costante, another Sandusky Police Department detective, testified that he was familiar with Ross and T.M. He did not know who Ross's mother was, but Katina was "[a]llegedly his mother." He said that T.M.'s cooperation with law enforcement investigations in the past was "[e]ssentially zero." He attributed that to T.M. being "involved in . . . the street life" and explained that "[p]art of that code of conduct of the street life is to not cooperate with the State, law enforcement, or any kind of law enforcement whatsoever. It's a . . . big no-no in their land."

{¶ 15} Costante had reviewed the security camera videos and recognized Ross as the person who did the stabbing.

{¶ 16} On cross-examination, Costante said that he had known Ross for approximately 14 years. Although he knew that Ross had been shot in 2016, he was unaware that the injury had "kind of stopped [Ross] from running" and that Ross had not run since 2016.

{¶ 17} Lewis, a shift supervisor for the Sandusky Police Department, testified that he is familiar with both Ross and T.M., and identified both of them on the security camera videos from the house. He noted that Ross was wearing a "dark-colored sweatshirt and light-colored sweatpants." He also identified Katina and said that she was Ross's mother.

5.

{¶ 18} Lewis helped look for Ross immediately after the stabbing. The officers looking for Ross checked the "whole area for him" but could not find him. When the officers could not find him, Lewis went back to the house to "secure it and look for evidence." Later, they received a call from a woman who said that Ross was at her house, but by the time officers got there, Ross had left. Officers were not able to arrest Ross the day of the stabbing.

{¶ 19} The state introduced security video from a restaurant that shows a man wearing a dark shirt and light pants running toward the restaurant on the opposite side of the street. The man turns down an alley and leaves the frame. About 10 seconds after Ross is out of view, Lewis's cruiser drives down the street. Lewis said that Ross was the man in the video.

{¶ 20} The next day, Lewis was called to assist another officer with Ross's arrest. Ross was wearing a gray sweatshirt, a dark-colored sweatshirt underneath the gray sweatshirt, gray sweatpants, and black shoes.

{¶ 21} Lewis also reviewed T.M.'s medical records, which the state had obtained from the second hospital where he sought treatment. Based on his review of the records, Lewis told the jury that T.M. went to the second hospital (after leaving Firelands against medical advice) for "evaluation of his right hand, as well as abdomen, after being stabbed." He was diagnosed with "[r]ight hand third metacarpal open fracture status post-stab wound" and "[a]bdominal stab wound with liver laceration." T.M. had surgery to repair both his hand injury and his liver laceration. Based on his law enforcement

6.

training and experience, Lewis believed that abdominal wounds were capable of causing death.

**{¶ 22}** Following Lewis's testimony, the state rested. Ross did not present any evidence.

**{¶ 23}** The jury found Ross guilty of both felonious assault charges. It was deadlocked on the attempted murder and tampering charges, so the state opted to dismiss those counts.

**{¶ 24}** At the sentencing hearing, the trial court found that the felonious assault charges were allied offenses of similar import and merged them for sentencing. The state chose to proceed on count 3, the felonious assault conviction under R.C. 2903.11(A)(1). The court found Ross guilty of the RVO specification, sentenced him to prison terms of 8 to 12 years for the felonious assault conviction and 6 years for the specification, and ordered him to serve the sentences consecutively for an aggregate sentence of 14 to 18 years.

**{¶ 25}** Ross now appeals, raising two assignments of error:

> The trial court committed plain error by not giving jury instructions on the definitions of cause and knowingly regarding physical harm on the Count II felonious assault charge of the indictment.

> The finding of guilty on the Count III felonious assault charge requiring serious physical harm was not supported by the manifest weight of the evidence.

7.

## II. Law and Analysis

### A. The trial court did not commit plain error when instructing the jury.

{¶ 26} In his first assignment of error, Ross argues that the trial court committed plain error by not instructing the jury on "cause" and "knowingly" as it relates to count 2, the felonious assault charge under R.C. 2903.11(A)(2). He alleges that, because the trial court defined the terms relevant to all of the counts in a single section that it read after reading the elements of each charge and specifically mentioned count 3 and an element of count 3—but not count 2 or its elements—in the definitions of cause and knowingly, "[t]he jury instructions did not accurately inform the jury of the law . . ." and the court "failed to instruct the jury on all of the essential elements of the count 2 felonious assault charge." The state responds that the jury instructions, taken as a whole, are not incorrect or misleading, and Ross cannot show that he was prejudiced by the court's instructions.

{¶ 27} Under Crim.R. 30(A), "[o]n appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict . . . ." When a defendant fails to object to the jury instructions, we review only for plain error. *State v. Owens*, 2020-Ohio-4616, ¶ 7. "To show reversible error under plain-error review, *see* Crim.R. 52(B), three elements must be met: there must first be a deviation from a legal rule, that deviation must be an obvious defect in trial proceedings, and the deviation must have affected substantial rights[.]" *State v. Gasper*, 2024-Ohio-4782, ¶ 14. Plain error should be found only in "exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Hill*, 92

8.

Ohio St.3d 191, 203 (2001), citing *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 28} Trial courts are charged with giving juries "complete and accurate" instructions that adequately reflect the issues argued in the case before them. *State v. Sneed,* 63 Ohio St.3d 3, 9 (1992). We review a jury instruction "'in the context of the overall charge.'" *State v. Diar*, 2008-Ohio-6266, ¶ 126, quoting *State v. Price*, 60 Ohio St.2d 136 (1979), paragraph four of the syllabus. That is, we consider instructions as a whole to determine whether or not the jury was likely misled in a matter materially affecting the substantial rights of the party claiming error. *Miller v. Defiance Regional Med. Ctr.*, 2007-Ohio-7101, ¶ 40 (6th Dist.), citing *Becker v. Lake Cty. Mem. Hosp. W.,* 53 Ohio St.3d 202, 208 (1990).

{¶ 29} When the trial court instructed the jury in this case, it first listed the elements of each of the four counts, without providing definitions for any of the terms in those counts. After it told the jury about all four counts, it provided a section of definitions. In that section, the court defined "cause" and "knowingly" as follows:

> Cause. The State charges that the act of the Defendant caused serious physical harm to [T.M.] Cause is an essential element of the offense of Felonious Assault. Cause is an act or failure to act which, in a natural and continuous sequence, directly produces the serious physical harm to person and without which it would not have occurred.

> The Defendant's responsibility is not limited to the immediate or most obvious result of the Defendant's act. The Defendant is also responsible for the natural and foreseeable consequences and/or results that follow in the ordinary course of events from the act.

> . . .

9.

Knowingly. A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result. A person has knowledge of circumstances when he is aware that such circumstances probably exist. Since you cannot look into the mind of another, knowledge is determined from all the facts and circumstances in evidence. You will determine from these facts and circumstances whether there existed at the time in the mind of the Defendant an awareness of the probability that his conduct would cause serious physical harm to [T.M.] for Count 3, Felonious Assault.

{¶ 30} Ross complains that the trial court's references to "serious physical harm" in the cause instruction and "Count 3" in the knowingly instruction show that the court did not instruct the jury on all of the elements of felonious assault under R.C. 2903.11(A)(2), which is a different subsection than the one charged in count 3 and requires only proof of "physical harm." However, considering the trial court's instructions as a whole, we cannot say that the court's failure to mention count 2 or simple physical harm likely misled the jury in a matter materially affecting Ross's substantial rights. For both count 2 and count 3, the trial court told the jurors that the state was required to prove that Ross "knowingly caused" certain harms, and the cause and knowingly instructions were in a section of definitions common to all of the counts. Under these circumstances, the trial court's omission of information about count 2 in the definition section does not rise to the level of plain error. Therefore, Ross's first assignment of error is not well-taken.

**B. Ross's conviction of count 3 is not against the weight of the evidence.**

{¶ 31} In his second assignment of error, Ross argues that his conviction of felonious assault for knowingly causing serious physical harm to T.M. is against the

10.

weight of the evidence. He contends that "there was not ample evidence from which a rational trier of fact could conclude that Mr. Ross caused serious physical harm" because T.M. did not testify. The state responds that the jury did not clearly lose its way by finding that the state proved serious physical harm, even without T.M.'s testimony, because his medical records established that he had a broken bone and lacerated liver that both required surgery.

{¶ 32} When we review a claim that a verdict is against the manifest weight of the evidence, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). We do not view the evidence in a light most favorable to the prosecution. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson*, 2012-Ohio-6068, ¶ 15 (6th Dist.), citing *Thompkins* at 387. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 33} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the jury's credibility determinations, given that it is the jury that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and

discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). The jury, as the finder of fact and the sole judge of the weight of the evidence and the credibility of the witnesses, may believe or disbelieve all, part, or none of a witness's testimony. *State v. Caudill*, 2008-Ohio-1557, ¶ 62 (6th Dist.), citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 34} After carefully reviewing the evidence and the credibility of the witnesses and weighing the testimony, we are not convinced that this is an exceptional case in which the evidence weighs heavily against a conviction. The state presented evidence—in the form of T.M.'s medical records—that the stab wounds caused an open fracture of his metacarpal and a liver laceration that both required surgical intervention. This constitutes serious physical harm. *See, e.g., State v. Hendricks*, 2020-Ohio-5218, ¶ 35 (6th Dist.) (finding that felonious assault conviction was not against the weight of the evidence when "it is undisputed that [defendant] broke [victim's] nose, necessitating surgery"); *State v. Lee*, 2008-Ohio-253, ¶ 30 (6th Dist.) ("[W]here the assault causes a bone fracture, the element of serious physical harm is met." (Internal quotation omitted.)); R.C. 2929.01(A)(5). The fact that this information did not come directly from T.M. is immaterial. Therefore, Ross's conviction under R.C. 2903.11(A)(1) is not against the manifest weight of the evidence, and his second assignment of error is not well-taken.

12.

## III. Conclusion

**{¶ 35}** Based on the foregoing, the November 18, 2024 judgment of the Erie County Court of Common Pleas is affirmed. Ross is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J. _____

Christine E. Mayle, J. _____

Charles E. Sulek, P.J. _____
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.

13.