[Cite as *State v. Armstrong*, 2025-Ohio-771.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                   Court of Appeals No.   L-24-1025
                                                                       L-24-1026

     Appellee                                Trial Court No. CR0202002188
                                                                       CR0202302508

v.

Adrian Armstrong                                **DECISION AND JUDGMENT**

     Appellant                               Decided: March 7, 2025

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Karin L. Coble, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} In this consolidated appeal, appellant, Adrian Armstrong, appeals the January 29, 2024 judgments of the Lucas County Court of Common Pleas sentencing him following his conviction of aggravated possession of drugs, having weapons while under disability, and carrying a concealed weapon. For the following reasons, we affirm.

## I. Background and Facts

{¶ 2} Armstrong was indicted in two separate cases. In the first, trial court case No. CR-20-2188 ("2020 case"), he was indicted on one count each of carrying concealed weapons in violation of R.C. 2923.12(A)(2), a fourth-degree felony, and aggravated possession of drugs in violation of R.C. 2925.11(A) and (C)(1)(a), a fifth-degree felony.[1] In the second, trial court case No. CR-2023-2508 ("2023 case"), he was indicted on one count each of having weapons while under disability in violation of R.C. 2923.13(A)(3), a third-degree felony, and carrying concealed weapons in violation of R.C. 2923.12(A)(2), a fourth-degree felony.

{¶ 3} All charges against Armstrong were tried to a jury. The state presented the testimony of Toledo Police Department officer Matthew Sulick; detectives George Stauch and Aaron Dudley; sergeants Gabe Greenwalt and Kenneth Krabil; and forensics laboratory employees including Chadwyck Douglas and David Cogan. The following evidence was adduced at trial.

### A. 2020 case

{¶ 4} In July 2020, Stauch, a member of the TPD vice narcotics unit, was in a parking lot on Sylvania Avenue in Toledo conducting undercover surveillance for an unrelated narcotics complaint. While he was there, a red Elantra and a blue Impala drove into the lot. The Elantra parked next to Stauch's car, and the Impala parked "nose-to-

---

[1] He was also indicted on one count of aggravated trafficking in drugs that was dismissed before trial.

2.

nose" with the Elantra and was "just catty-corner from where [Stauch] was sitting, within ten feet of where [Stauch] was sitting . . . ." His attention was drawn to the cars because of the "quick succession that they entered the parking lot and it was also COVID so there were no other cars in the parking lot at that time." He saw one man in the Elantra and two people in the front seats of the Impala, a man in the driver's seat and a woman in the passenger seat. Shortly after they arrived, the driver of the Impala left his car and walked to the driver's door of the Elantra. Stauch identified the driver of the Impala as Armstrong. He could see directly into the Elantra, and while Armstrong was at the Elantra's window, the driver of the Elantra reached down toward his waistband and pulled out a bag of what Stauch thought "appeared to be narcotics." Stauch saw the bag because the driver was "flipping it in his hand, holding both corners of the bag and flipping it." He also saw Armstrong lean into the window and drop a small bag. He said this "appeared to be a hand-to-hand transaction." After that, Armstrong walked back to the Impala's driver's seat. A third car drove up, and a man got out, went to the Elantra, and appeared to engage in a hand-to-hand transaction with the driver. Stauch "could clearly see money in [the driver's] hand after . . ." the driver of the third car walked away from the Elantra.

{¶ 5} Stauch contacted the TPD SWAT unit to come to the scene. While he waited for their arrival, he saw Armstrong get out of the Impala for a second time and get into the passenger seat of the Elantra. Stauch saw the driver of the Elantra "appear to be making a marijuana cigarette . . . ." Shortly after, the SWAT unit arrived and made

3.

arrests. When Stauch patted down the driver of the Elantra, he found a bag of marijuana "in his genital area." Another officer, Greenwalt, found a loaded gun and a bag of pills in the Impala. Greenwalt told Stauch that he found the pills "[i]n the door handle area, like where you would grab the door, . . ." on the driver's side of the car. Other officers also found some mail addressed to Armstrong in the Impala's glove compartment and Armstrong's state identification card in the car. Stauch never saw the Impala's passenger move to the driver's side of the vehicle.

{¶ 6} On cross-examination, Stauch said that the bag Armstrong dropped into the Impala was small, about the size of a grape. He was about seven feet away from the car. He did not request the bag containing the pills be tested for fingerprints. About five minutes elapsed from the time Armstrong got into the Elantra to the time that he was arrested. The Impala's passenger did not leave the car during that time. Stauch admitted that he never saw Armstrong carrying a firearm or the pills found in the Impala.

{¶ 7} Greenwalt, a member of the TPD SWAT unit, testified that he was dispatched to Sylvania Avenue to assist an undercover narcotics officer. As he was moving toward the vehicles, he saw one person in the passenger seat of the Impala. Greenwalt found the bag of pills "in the door handle . . . in the little slot as if like when you were to pull your door shut that little pocket . . . ." He also found Armstrong's state identification card and some mail addressed to Armstrong in the car.

{¶ 8} On cross, Greenwalt admitted that he never saw Armstrong anywhere near the pills found in the door handle.

{¶ 9} Douglas, a drug analyst in the TPD crime lab, tested the pills found in the Impala. He found that they contained methamphetamine, pentylone, and caffeine.

**B. 2023 case**

{¶ 10} In September 2023, Dudley, a detective in the TPD gang task force unit, and his partner, Krabil, were doing "proactive policing" on the east side of Toledo. That day, an undercover officer saw Armstrong, "who was known to have felony warrants . . . ."

{¶ 11} Dudley and Krabil drove to the area where Armstrong was located and saw him on the front porch of a duplex on Nevada Street in Toledo. The officers parked in an alley so they could "sneak up on [Armstrong] so he doesn't run." When the officers rounded the corner and saw Armstrong on the porch, they ordered him to show his hands and told him not to run. Despite that, Armstrong ran into the duplex. Dudley followed him inside toward the upper apartment. There was a stack of bench seats from a car in the hallway where Dudley found Armstrong.

{¶ 12} At first, Dudley testified that he saw Armstrong run to the end of the pile of car seats and "slowly pick[] up his right hand . . . ." Dudley "all the sudden [] looked right where his immediate area was and there was a firearm." By the time Dudley had drawn his gun, Armstrong "had his hands up and he basically gave up after that." Soon after, Dudley clarified what happened when he entered the duplex. He said that he saw Armstrong reach for his waistband and when "he brought it up [Dudley] saw the gun . . . ." When Armstrong "got towards the end of the [car] seats[,] you could see him drop

5.

something and slowly raise his hands up and surrender."  Dudley also saw "some furtive movements on [Armstrong's] right hand" while he was near the end of the pile of car seats.  After officers took Armstrong into custody, they checked the area where Armstrong had been standing and found the gun on one of the car seats.  When officers searched Armstrong after his arrest, they found "a holster on his person along with some marijuana."

{¶ 13} The state presented footage from Dudley's body camera as an exhibit.  In the video, Dudley and Krabil approach the porch from the side of the house, and one of them yells "show me your hands" and "don't do it."  After that, Dudley jumps onto the porch and runs toward the door.  As soon as he enters the door of the duplex, Dudley yells "gun" and "get on the ground now."  The lens of the camera is blocked at this point, so the video does not show what Armstrong was doing when Dudley first saw him.  A few seconds later, the video shows Dudley handcuffing Armstrong and walking him out the door.

{¶ 14} The state also presented the docket sheet from the 2020 case showing that the trial court had entered a warrant for Armstrong on August 29, 2022, because he failed to appear for a pretrial.

{¶ 15} On cross, Dudley said that he did not announce that he was with TPD when he approached Armstrong on the porch.  He only said, "show me your hands and don't do it . . . ."  He chased Armstrong for two to three seconds.  He went fully inside the duplex and was four or five feet from Armstrong.  He definitively testified that he saw

6.

Armstrong with the gun after Armstrong ran into the duplex. However, in his supplemental report regarding the incident, Dudley stated that "[w]hen we approached originally before we ran, we did not see the firearm because it was covered." He could not give a reason why he did not state in the supplemental report that he saw a gun. He further elaborated that Armstrong had pulled a gun from a holster. He could not think of any reason why someone would wear a holster and not have a firearm and denied that it was possible that "the potential scene or sight of a holster [could] maybe thwart someone without actually carrying a firearm[.]"

{¶ 16} Dudley did not talk to the other man at the duplex—a potential witness—or talk to any other officers about the man. He recalled seeing a vehicle beside the duplex, but did not look inside it. Dudley submitted the gun for fingerprint and DNA testing but had not gotten the results at the time of trial or followed up on the lab's progress in processing the evidence.

{¶ 17} On redirect, Dudley read from his supplemental report, in which he wrote that Armstrong "was observed to have a holster in his pants and a firearm was observed . . . . [Dudley] did not originally observe a firearm or holster on Armstrong while giving commands. His shirt was covering the firearm and holster in his waistband."

{¶ 18} Krabil, a sergeant with the TPD gang task force, testified that he and Dudley went to the duplex on Nevada because the officer who originally saw Armstrong there was in plainclothes and conducting surveillance, so he was "not in a capacity to conduct a stop . . . ." He and Dudley parked in an alley and walked along the side of the

7.

house. When they turned the corner, they saw Armstrong on the porch, and when they "[s]aid Adrian come here, he turned and ran into the door . . . and [they] provided chase in that entryway there." Krabil was behind Dudley and heard Dudley yell "gun." He recalled that the gun was on the second or third lowest car seat in the pile in the hallway. Krabil could not recall if he saw the holster before or after it was removed from Armstrong's waistband but he definitely remembered seeing it that day.

{¶ 19} The state presented a second video from a body camera during Krabil's testimony. The prosecutor did not ask Krabil if the footage was from his body camera, so it is unclear if the footage came from his camera or Dudley's camera. This video shows Armstrong handcuffed on the porch and shows a gun holster clipped to the front of his waistband. The officer wearing the camera refers to Armstrong having a gun on him.

{¶ 20} On cross, Krabil testified that he never saw Armstrong with a firearm. He said that it was TPD policy for officers to turn on their body cameras when serving warrants. Despite that, Krabil did not turn on his body camera until after Armstrong was arrested. He explained that "after everything settled down, [he] probably went to turn it off and turned it on and [he] probably just left it on."

{¶ 21} Sulick, a TPD patrolman, responded to the duplex. Inside the door to the upper apartment was a hallway; a pile of bench seats from a car and a suitcase were stacked along the left wall. Sulick found a loaded gun sitting on one of the seats in the pile.

8.

{¶ 22} On cross-examination, Sulick testified that Armstrong had been detained and handcuffed by other officers by the time he arrived at the duplex. He never saw Armstrong carrying a gun. Another man was at the duplex that day doing some renovations. Sulick spoke to him briefly but could not recall if he asked the man if the gun on the car seat was his. He also could not recall which side of the duplex the man was working on. The man was driving a work van that Sulick did not recall looking inside. He admitted that the car seats in the hallway "[p]ossibly" could have come from the work van. He did not look at the luggage tag on the suitcase to see who it belonged to. He found the gun about five to ten yards from the door.

{¶ 23} Cogan, the administrator of the TPD forensic lab, tested the gun from the duplex and found that it was operable.

{¶ 24} On cross, Cogan explained that the gun came with a work request asking that it be tested for operability. He was unsure if anyone had asked for the gun to be fingerprinted and tested for DNA but said that those tests were handled by a different unit and would be done before he test fired the gun.

{¶ 25} After Cogan's testimony, the state rested.

{¶ 26} Armstrong moved for acquittal under Crim.R. 29, arguing that the state had not proven that Armstrong was carrying the drugs or gun. He pointed out that the testimony of the only officer who said he saw Armstrong with a gun was contradicted by the police report. The state responded that, in the 2020 case, the drugs were in the "door compartment" on the driver's side, and Armstrong "occupied" the driver's side of the car.

9.

In the 2023 case, the officer saw Armstrong "dispose of the firearm," and Armstrong had a holster on him when he was arrested.

{¶ 27} The trial court denied Armstrong's motion. It agreed with the state's assessment of the charges in the 2020 case, and because the state did not have to prove actual possession, based on the evidence, the jury could reasonably infer that the state had established all of the elements of the charges in the 2023 case.

## C. Outcome

{¶ 28} The jury found Armstrong guilty of aggravated possession of drugs in the 2020 case, not guilty of carrying concealed weapons in the 2020 case, and guilty of both counts in the 2023 case. The trial court sentenced him to prison terms of 11 months for the aggravated possession charge, 12 months for the concealed weapons charge, and 18 months for the weapons under disability charge. The court ordered Armstrong to serve his sentences concurrently for an aggregate prison term of 18 months.

{¶ 29} Armstrong now appeals, raising two assignments of error:

> Assignment of Error One: The conviction for aggravated possession of drugs was unsupported by sufficient evidence and was against the manifest weight of the evidence.

> Assignment of Error Two: The conviction for having a weapon under disability was unsupported by sufficient evidence and was against the manifest weight of the evidence.

## II. Law and Analysis

10.

{¶ 30} In his assignments of error, Armstrong argues that his possession and weapons under disability convictions are unsupported by sufficient evidence and are against the manifest weight of the evidence. Regarding the possession conviction, he contends that the state failed to show that he had constructive possession of the methamphetamine found in the door handle of the Impala because the only evidence showing that Armstrong was aware of the drugs' existence was the bag's location in the driver's door, and the state failed to produce evidence that Armstrong owned the car or was able to exercise dominion and control over it. Regarding the weapons under disability conviction, he contends that the state failed to show that he had constructive possession of the gun found in the duplex because Dudley's testimony contradicted his supplemental police report and police did not interview the witness who was at the duplex when Armstrong was arrested.

{¶ 31} The state responds that it sufficiently showed that Armstrong constructively possessed the drugs based on Armstrong's behavior just before the police discovered the drugs; the drugs' location in the handle of the car door, which Armstrong used at least twice while Stauch observed the Impala; and the facts that Armstrong was driving the car and had mail addressed to him in the glove box. It also contends that it sufficiently showed that Armstrong constructively possessed the gun found at the duplex based on the location of the gun and Dudley's testimony, which the jury was entitled to believe, being consistent with his report. And it points out that the officers did not have a duty to interview every potential witness or perform every possible test on evidence.

11.

**A. Armstrong's convictions are supported by sufficient evidence.**

{¶ 32} Armstrong argues that there was insufficient evidence to convict him of aggravated possession of drugs and having weapons under disability. We disagree.

{¶ 33} In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). We do not weigh the evidence or assess the credibility of the witnesses. *State v. Were*, 2008-Ohio-2762, ¶ 132. "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 2016-Ohio-8448, ¶ 13. Naturally, this requires "a review of the elements of the charged offense and a review of the state's evidence." *Id.* Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 34} As relevant here, to convict Armstrong of aggravated possession of drugs, the state was required to prove that Armstrong knowingly possessed a controlled substance that was "a compound, mixture, preparation, or substance included in schedule I or II, with the exception of marihuana, cocaine, L.S.D., heroin, any fentanyl-related compound, hashish, and any controlled substance analog . . . ." R.C. 2925.11(A), (C)(1). To convict Armstrong of having weapons under disability, the state was required to prove that Armstrong knowingly had or carried a firearm while he was under indictment for a felony offense involving the illegal possession of any drug of abuse. R.C. 2923.13(A)(3).

12.

{¶ 35} A person acts "knowingly" when, regardless of his purpose, he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. R.C. 2901.22(B). "Possession" means "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). Methamphetamine is a schedule II drug and a drug of abuse. Ohio Adm. Code 4729:9-1-02(C)(2); R.C. 3719.01(C); R.C. 3719.011(A). A gun is a firearm. *In re Marcus T.D.*, 2004-Ohio-477, ¶ 9 (6th Dist.), citing R.C. 2923.11; R.C. 2923.11(B); Aggravated possession of drugs in violation of R.C. 2925.11 is a drug abuse offense. R.C. 2925.01(G)(1).

{¶ 36} The State can prove the "had" element of a possession offense by showing that the defendant had either actual or constructive possession of the object. *State v. Brooks*, 2020-Ohio-6648, ¶ 12 (6th Dist.). "Actual possession requires ownership or physical control." *State v. Galindo*, 1999 WL 461749, *3 (6th Dist. July 9, 1999), citing *State v. Messer*, 107 Ohio App.3d 51, 56 (9th Dist. 1995). Constructive possession means that a person "'knowingly exercises dominion and control over an object, even though that object may not be within his immediate physical possession.'" *In re Israel D.*, 1996 WL 339918, *4 (6th Dist. June 21, 1996), quoting *State v. Hankerson*, 70 Ohio St.2d 87 (1982).

{¶ 37} "Constructive possession of [contraband] may be inferred from 'the surrounding facts and circumstances, including the defendant's actions.'" *State v.*

13.

*Washington*, 2014-Ohio-1008, ¶ 31 (6th Dist.), quoting *State v. Pilgrim*, 2009-Ohio-5357, ¶ 28 (10th Dist.); *State v. Teamer*, 82 Ohio St.3d 490, 492 (1998). Something more than close proximity is necessary to show constructive possession. R.C. 2925.01(K). But "presence in the vicinity of contraband, coupled with another factor or factors probative of dominion or control over the contraband, may establish constructive possession." *State v. Brown*, 2009-Ohio-5390, ¶ 20 (4th Dist.). Possession of the keys to an automobile "'is a strong indication of control over the automobile and all things found in or upon the automobile.'" *State v. Reed*, 2018-Ohio-4451, ¶ 16 (6th Dist.), quoting *State v. Buckley*, 1986 WL 1748, *1 (7th Dist. Feb. 6, 1986). Additionally, "where contraband is found in a vehicle driven by the defendant, the State need not prove that the defendant owned the vehicle." *State v. Harris*, 2024-Ohio-4722, ¶ 19 (6th Dist.).

{¶ 38} Here, Armstrong first argues that the state failed to show that he constructively possessed the drugs found in the Impala because it showed only that the drugs were in the door handle, not that Armstrong was conscious of their existence, and it was equally reasonable to infer that the passenger put the drugs in the door without Armstrong's knowledge.

{¶ 39} When we construe the evidence in the state's favor, we find that it is sufficient to show that Armstrong constructively possessed the drugs in the door handle. First, Armstrong was driving the Impala, which is sufficient to show that he exercised dominion and control over the car and the area around the driver's seat. *Reed* at ¶ 16-18. Officers finding mail addressed to Armstrong and his state identification card in the

14.

Impala is additional circumstantial evidence that Armstrong exercised dominion and control over the car. The state was not required to prove that Armstrong owned the car to show that he constructively possessed drugs in the car. *Harris* at ¶ 19.

{¶ 40} Next, Armstrong was driving the Impala and sitting where the drugs were easily accessible. Constructive possession of drugs can be established when the drugs are found in an area easily accessible to the driver. *Brown* at ¶ 20. In fact, Armstrong used the interior door handle twice while Stauch was watching him, so it is reasonable to infer that Armstrong was aware of the bag of drugs stored near the handle. Additionally, Stauch saw Armstrong give what appeared to be drugs to the driver of the Elantra—from which the jury could infer that Armstrong took drugs from the car to the Elantra. The presence of these factors shows that the state proved something more than mere proximity to the drugs. *Compare State v. Devaughn*, 2020-Ohio-651, ¶ 35-37 (1st Dist.) (evidence was insufficient to support possession charge when officers saw defendant lean into a car that contained drugs, but there was no testimony about him accessing center console where drugs were stored, no evidence that he placed items in or removed items from the car, and no evidence that he had ever driven the car or had keys to it).

{¶ 41} Finally, Armstrong's argument that his passenger could have been responsible for the drugs does not help his position because two or more people can have constructive possession of the same object. *Reed*, 2018-Ohio-4451, at ¶ 20 (6th Dist.). In other words, the fact that his passenger might also have had something to do with the drugs does not preclude a finding that Armstrong constructively possessed them.

15.

{¶ 42} Taken together, these facts sufficiently show that Armstrong constructively possessed the drugs found in the Impala.

{¶ 43} Armstrong also argues that the state failed to show that he constructively possessed the gun that officers found at the duplex. This argument ignores the fact that the state presented evidence showing that Armstrong had *actual* possession of the gun. Dudley testified that he saw Armstrong with a gun and saw him drop something, Dudley's body camera video showed him yelling "gun" as soon as he entered the duplex, and the gun was found immediately next to the area where Dudley apprehended Armstrong. This evidence of actual possession is sufficient to support Armstrong's weapons under disability conviction.

**B. Armstrong's convictions are not against the manifest weight of the evidence.**

{¶ 44} Armstrong also argues that his convictions are not supported by the manifest weight of the evidence. Again, we disagree.

{¶ 45} When we review a claim that a verdict is against the manifest weight of the evidence, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387. We do not view the evidence in a light most favorable to the prosecution. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson*, 2012-Ohio-6068, ¶ 15 (6th Dist.), quoting *Thompkins* at 387. Reversal on

16.

manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172*,* 175 (1st Dist. 1983).

{¶ 46} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the jury's credibility determinations, given that it is the jury that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). The jury, as the finder of fact and the sole judge of the weight of the evidence and the credibility of the witnesses, may believe or disbelieve all, part, or none of a witness's testimony. *State v. Caudill*, 2008-Ohio-1557, ¶ 62 (6th Dist.), citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 47} After carefully reviewing the evidence and the credibility of the witnesses and weighing the testimony, we are not convinced that this is an exceptional case in which the evidence weighs heavily against the convictions. Armstrong's manifest-weight argument regarding the possession conviction boils down to him disagreeing with the jury's decision to accept one inference about the drugs over another inference, i.e., the jury chose to infer that Armstrong knew about the drugs in the door handle instead of choosing to infer that his passenger put the drugs there. Based on the evidence, however, this was a reasonable choice, and we cannot say that the jury lost its way in that regard.

17.

{¶ 48} Armstrong's manifest-weight argument regarding the weapons under disability conviction focuses on Dudley's credibility. He argues that Dudley's supplemental report "directly contradicts his trial testimony and Dudley had no explanation for the discrepancy[,]" and combined with the fact that the other person at the duplex was not interviewed, this shows that his weapons under disability conviction is against the weight of the evidence.

{¶ 49} Dudley's report did not "directly contradict[]" his testimony. In it, Dudley wrote that Armstrong "was observed to have a holster in his pants and *a firearm was observed* . . . . [Dudley] did not *originally* observe a firearm or holster on Armstrong *while giving commands*. His shirt was covering the firearm and holster in his waistband." (Emphasis added.) Dudley testified that he saw Armstrong and gave him commands while Armstrong was on the duplex's porch, before he chased Armstrong into the duplex and saw Armstrong with a gun that he dropped. This is entirely consistent with Dudley's statements in his report that "a firearm was observed" and he did not see a gun *at first*. Dudley's testimony is also supported by his body camera video, in which he yelled "gun" when he got inside the duplex. Although the gun is not visible in the video, Dudley's reaction implies that he saw a gun in the hallway when he was there with Armstrong, and it is reasonable to infer that the gun he saw was not hidden in the stack of car seats, where it was not immediately visible in the hallway. On the whole, Dudley's testimony was credible, and the jury did lose its way by believing it.

18.

**{¶ 50}** Given the evidence before it, the jury did not clearly lose its way by finding Armstrong guilty.  Accordingly, Armstrong's convictions are not against the manifest weight of the evidence.

**{¶ 51}** Armstrong's assignments of error are not well-taken.

### III. Conclusion

**{¶ 52}** Based on the foregoing, the January 29, 2024 judgments of the Lucas County Court of Common Pleas are affirmed.  Armstrong is ordered to pay the costs of this appeal under App.R. 24.

Judgments affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

Christine E. Mayle, J.

Myron C. Duhart, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.